UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
                                      :

UNITED STATES OF AMERICA,               :

                                        :

          -v-                      :          22-CR-93 (JMF)

                                        :

LANAIR MILTON,                      :          <u>OPINION AND ORDER</u>

                                        :

                    Defendant.           :

                                        :

------------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

        Defendant Lanair Milton is charged with one count of being a felon in possession of a

firearm after a gun was recovered from his jacket pocket during a traffic stop by three officers of

the New York City Police Department ("NYPD").  On April 17, 2022, Milton moved to suppress

the firearm on the ground that, when the search that yielded the firearm was conducted, the

NYPD officers did not harbor a reasonable suspicion that he was armed and dangerous.  *See* ECF

Nos. 17-18.  Last month, the Court held an evidentiary hearing, at the end of which it ruled from

the bench that the search was supported by reasonable suspicion.  During oral argument on the

motion, however, Milton's counsel advanced a new argument to challenge the search: that the

car stop that preceded it was unreasonably prolonged in violation of the Fourth Amendment.

The Court directed the parties to file post-hearing briefs addressing the merits of that argument

and the question of whether Milton forfeited it.  The parties have now done so.  *See* ECF No. 37

("Gov't Supp. Br."); ECF No. 38 ("Milton Supp. Br."); *see also* ECF Nos. 39-40.

        For the reasons that follow, the Court exercises its discretion to consider Milton's new

argument, not the least because it has merit.  That is, the Supreme Court's decision in *Rodriguez*

*v. United States*, 575 U.S. 348, 350 (2015), and the Second Circuit's decision in *United States v.*

*Gomez*, 877 F.3d 76, 90 (2d Cir. 2017), compel the conclusion that the car stop here was unreasonably prolonged in violation of the Fourth Amendment.  For *that* reason, the search of Milton that yielded the firearm was unlawful, and the firearm must be and is suppressed.

## RELEVANT FACTS

The relevant facts are largely undisputed, in no small part because the record includes footage from the body cameras of all three NYPD officers involved in the incident.  *See* GX 1-3.[1]  In addition, two of the officers testified at the evidentiary hearing held on July 27, 2022.

On November 19, 2021, at approximately 11:00 p.m., three uniformed NYPD officers — Officer Hansel Salcedo, Sergeant Dionicio Brito, and Officer Wilfredo Burgos — were in an unmarked NYPD patrol car driving southbound on Lexington Avenue and approximately 115th Street when they observed Milton walking down the street, away from their patrol car.  Tr. 6-8.  Thereafter, the officers observed Milton get into the passenger seat of a car (the "Car"), the windows of which they observed to be heavily tinted.  Tr. 8-9, 33, 98; GX 4.  As the officers neared the Car, Officer Salcedo looked up the license plate in a law enforcement database and learned that the owner was on probation and had a prior firearms conviction.  Tr. 9-10, 41-42.[2]  After observing the car pull out and cross two lanes of traffic without signaling, the officers conducted a traffic stop of the Car on the ground that its windows were excessively tinted — although changing lanes without signaling also justified the initial stop.  Tr. 10-11, 88-89; *see* N.Y. Veh. & Traf. Law § 375(12-a); *id.* § 1163.

---

[1]     "GX __" refers to a Government Exhibit admitted during the hearing, and "Tr." refers to the transcript of the July 27, 2022 evidentiary hearing.

[2]     At the hearing, Officer Salcedo testified that he learned the owner was on probation "for possession of a firearm," Tr. 10, but that is incorrect.  The owner, who was driving the car, had a prior firearms conviction and was on probation, but for a fraud offense.  *See* Milton Supp. Br. 2 n.2.  Milton accuses Officer Salcedo of testifying "false[ly]" on this score, *see* Milton Supp. Br. 2 n.2, but there is no reason to believe it was anything but an innocent mistake.

The precise timing of what transpired during the traffic stop is critical to the present

motion, so the Court will summarize what happened next with reference to the time stamps on

the officers' body camera footage.  At 1:20 of Government Exhibit 3 (Officer Burgos's body

camera footage), Officer Burgos arrived at the driver's side of the car.  Within five seconds,

Officer Burgos asked the Car's driver for his license, registration, and proof of insurance.  GX 3,

at 1:25.  After some effort to retrieve the requested documents, the driver produced them to

Officer Burgos at 2:08.  Approximately twenty-two seconds later, the driver asked Officer

Burgos why he was stopped, to which Officer Burgos responded: "just tinted windows."  GX 3,

at 2:30.  What followed was a short colloquy during which the driver informed Officer Burgos

that he had received a ticket for excessively tinted windows the prior month.  *See* GX 3, at 2:30-

3:15.  For the next minute or so, Officer Burgos and the driver did not exchange words; instead,

the officers can be seen shining their flashlights into the interior of the Car.  *See* GX 3, at 3:15-

4:32.  It can also be inferred, and the Court does infer, that during that time Officer Burgos

looked the driver up in a law enforcement database and checked for any open arrest warrants.

At or about the time that Officer Burgos approached the driver's side window, Officer

Salcedo approached the passenger side window.  *See* GX 2, at 1:20.  There, he observed Milton

sitting in the passenger seat without a seatbelt.  GX 2, at 1:37; Tr. 33.  At 2:09 of Government

Exhibit 2 (which corresponds to approximately 2:19 on Government Exhibit 3 as the two are ten

seconds apart), Officer Salcedo asked Milton — seated in the passenger seat — for his

identification.  Within approximately six seconds, Milton retrieved his driver's license from his

pants pocket and produced it to Officer Salcedo.  *See* GX 2, at 2:15.  Officer Salcedo then used

Milton's license to run a computer check to pull up his criminal history, which revealed that

there were no warrants for his arrest but that he too was on probation.  Tr. 13-14, 43-44.  Officer

Salcedo testified that this computer check took approximately one to two minutes to complete (which is consistent with the gap in Officer Burgos's colloquy with the driver during which, as discussed above, the Court infers that Officer Burgos was conducting his checks on the driver). Tr. 14, 39, 43-44. Accordingly, by no later than 4:15 on Officer Salcedo's body camera footage (and 4:25 or so on Officer Burgos's body camera footage), Officers Salcedo and Burgos had confirmed that there were no outstanding warrants for either Milton or the Car's driver.

At that point, however, the officers did not issue summonses or tickets for any of the infractions for which they indisputably had probable cause, namely excessive window tinting, changing lanes without signaling, and driving without a seatbelt; indeed, there is nothing in the record suggesting that the officers ever issued a summons or ticket to Milton or the Car's driver. Tr. 99. Nor, however, did the officers let the driver and Milton go. Instead, at 4:32 of Government Exhibit 3, Officer Burgos asked the driver what brought him to the area; the driver responded that he lived in the area, prompting follow up questions from Officer Burgos about why the driver's license showed a Bronx address. *See* GX 3, at 4:37. At 4:43, Officer Burgos then asked the driver when he was last arrested and for what offense. At 4:53, the driver responded that he had been arrested two years earlier for "fraudulent IDs." Officer Burgos then asked if there were "any fraudulent IDs in the car right now," GX 3, at 5:07-08, to which the driver responded no, *see id.* at 5:09. Forty-six seconds later, Officer Burgos asked if there were any weapons in the Car, after which he asked a series of questions about the driver's prior firearms offense, including whether he had served jail time and whether he was on probation. *See id.* at 5:55-6:34. A few seconds later, at 6:36, Officer Burgos asked the driver if he would consent to a search of the Car. When the driver declined, the officers tried for approximately seventeen seconds to persuade the driver to reconsider, noting that he was on probation and that

4

if he was "worried about . . . weed or something like that . . . , it's not that serious."  *See id.* at

6:45-7:02.  When that failed, Officer Burgos directed the driver to step out of the Car; almost

simultaneously, Officer Salcedo directed Milton out of the car.  *See id.* at 7:10; GX 2, at 7:00.

What happened next was critical to the Court's oral ruling on Milton's original motion,

but is not especially irrelevant here.  Long story short: Milton made a series of movements —

most notably, getting out of the Car in a manner seemingly designed to conceal his right side and

reaching his hand into his right jacket pocket despite at least two directions from Officer Salcedo

not to do so — that, the Court found, made it reasonable for Officer Salcedo to suspect that

Milton was armed and dangerous.  Tr. 148; *see* GX 1, at 7:20; GX 2, at 7:12-16.  In a matter of

seconds, if not less, Officer Salcedo grabbed Milton's right wrist, felt a hard object in his right

jacket pocket, reached into the pocket, and retrieved a firearm.  GX 1, at 7:20-28; GX 2, at 7:05-

24.  At that moment, Milton fled on foot and was arrested shortly thereafter.

## DISCUSSION

Milton argues that the car stop was unreasonably prolonged in violation of the Fourth

Amendment.  Tr. 117-21, 124-35; Milton Supp. Br. 1-4.  But there is a threshold question to be

answered: whether Milton can even raise that argument or whether he forfeited it by failing to

raise it in his initial, written motion to suppress.  To that threshold question, the Court turns.

### A.  Whether Milton Forfeited His Argument About the Duration of the Stop

The Court would be on firm ground deeming Milton to have forfeited the argument that

he now presses.  Under Rule 12(b)(3) of the Federal Rules of Criminal Procedure, a defendant

must raise any requests to suppress evidence before the start of trial or at a date selected by the

Court if the basis for the motion is "then reasonably available."  Fed. R. Crim. P. 12(b)(3); *see,*

*e.g.*, *United States v. Conners*, 816 F. App'x 515, 518 (2d Cir. 2020) (summary order) ("Where a

defendant fails to raise an argument in a pre-trial suppression motion, the argument is waived."). Here, the Court set a pretrial motion deadline of April 14, 2022.  ECF No. 16.[3]  And while Milton's counsel asserts that the theory now pressed was not "reasonably available" at that time, *see* Milton Supp. Br. 4-5; ECF No. 40, that argument is difficult to credit.  After all, the Government produced the body camera footage from the three NYPD officers involved in the traffic stop (and Jencks Act material for all three officers) on March 2, 2022, *see* Gov't Supp. Br. 1; *see also* ECF Nos. 39-40, well before Milton filed his written pretrial motion.

    That said, the Court exercises its "discretion" to permit Milton to raise the new argument. *United States v. Atuana*, 816 F. App'x 592, 597 (2d Cir. 2020) (summary order).  Under Rule 12(c)(3) of the Federal Rules of Criminal Procedure, "[a] district court may grant relief from an untimely motion 'upon a showing of: (1) cause for the defendant's non-compliance, and (2) actual prejudice arising from the waiver.'"  *United States v. Moore*, 541 F. App'x 37, 39 (2d Cir. 2013) (summary order) (quoting *United States v. Howard*, 998 F.2d 42, 52 (2d Cir. 1993)); *see also* Fed. R. Crim. P. 12(c)(3).[4]  "[G]ood cause" in this context "requires at a minimum that the party seeking a waiver articulate some legitimate explanation for the failure to timely file."  *United States v. Archuleta*, No. 02-CR-1060 (LAP), 2018 WL 8646703, at *2 (S.D.N.Y.

---

[3]     As it happens, Milton's initial motion was itself filed after this deadline, albeit by only three days.  *See* ECF No. 17.  The Government did not argue for denial of the motion on that basis, and the Court chose to treat the motion as timely filed.

[4]     Rule 12(c)(3) provides: "[A] court may consider [a] defense, objection, or request [that is untimely under Rule 12(b)(3)] if the party shows good cause."  Fed. R. Crim. P. 12(c)(3).  Language to this effect was originally included in Rule 12(f) and shifted to Rule 12(e) without substantive change in 2002.  *See* Fed. R. Crim. P. 12, Advisory Committee's Note to 2002 Amendments.  It was moved to Rule 12(c)(3) in 2014.  *See id.* Advisory Committee's Note to 2014 Amendments ("The effect of failure to raise issues by a pretrial motion has been relocated from (e) to (c)(3)."); *see also United States v. Gatling*, No. 3:20-CR-196 (MPS), 2022 WL 42759, at *2 (D. Conn. Jan. 5, 2022).

July 31, 2018) (cleaned up).  Here, Milton's counsel has done so — albeit not by much.  *See*
ECF No. 40.  Although the general argument that the stop was unlawfully prolonged may have
been "reasonably available" to Milton at the time of the written motion, the factual basis for the
argument was not entirely clear until the July 27, 2022 evidentiary hearing, which established the
critical fact of how long it took for Officer Salcedo to check Milton for outstanding warrants
(and, by extension, how long it took Officer Burgos to check the driver for the same).  *See* Tr.
13-14, 39.  That information, as Milton's counsel points out, bears directly on "when the traffic
stop reasonably should have concluded."  ECF No. 40.

It is also notable that, at its core, the claim is identical to the one that Milton pressed in
his written motion: that the firearm should be suppressed because the search was conducted in
violation of the Fourth Amendment.  *See* ECF No. 18, at 8.  Granted, it is premised on a different
theory of constitutional infirmity; but the fundamental basis of the claim is the same.  The Court
therefore concludes Milton's counsel has shown good cause for relief from waiver.  *See, e.g.*,
*United States v. Shine*, No. 17-CR-28 (FPG) (JJM), 2019 WL 2442145, at *3 (W.D.N.Y. June 12,
2019) (concluding the   defendant had shown good cause for a late suppression motion
despite the fact that "[d]efendants could have raised certain aspects of their argument" before,
because new evidence "provided . . . greater context concerning the [traffic] stop" at issue);
*United States v. Maclin*, No. 14-CR-108A (HBS), 2015 WL 72197, at *3 (W.D.N.Y. Jan. 6,
2015) (finding good cause for a failure to timely raise an argument for suppression where the
defendant had "timely" filed an "initial motion to suppress"); *United States v. Tracy*, No. 94-
CR-142S (WMS), 1995 WL 522807, at *3 (W.D.N.Y. Aug. 24, 1995) (concluding that the
"defendant ha[d] shown good cause for relief from waiver" where the issue had not been "clearly
present[ed]" before the motion deadline); *United States v. Davis*, 598 F. Supp. 453, 455

(S.D.N.Y. 1984) (finding good cause for a late motion despite concluding it "could have been made earlier").  Additionally, as discussed below, the argument has merit.  Barring Milton from raising it now would thus cause him extreme prejudice — and would be contrary to the interests of justice.[5]

By contrast, the Court's willingness to entertain the new argument will cause the Government no unfair prejudice (except insofar as it permits Milton to make an argument that, as discussed below, is meritorious — but that, of course, is not a form of cognizable prejudice to the Government).  Milton raised the issue six full weeks before trial and it was fully briefed five weeks before trial.  There is no need for additional discovery or another evidentiary hearing as the record was fully developed at the July 27, 2022 hearing.  Both sides had an opportunity to be heard on the issue.  And, given the nature of this case (namely, that an officer seized a firearm from Milton's person and the seizure was captured on video), it is almost certain that, one way or another, a ruling on suppression will be dispositive and there will be no need for a trial.  Taken together, these circumstances distinguish this case from those cited by the Government in support of its forfeiture argument.  *See*, *e.g.*, *United States v. Yousef*, 327 F.3d 56, 125 (2d Cir. 2003) (involving a defendant who waited until appeal to challenge a violation of his right to silence and right to counsel); *Conners*, 816 F. App'x. at 518 (involving a defendant who waited until appeal to challenge his arrest); *Moore*, 541 F. App'x at 39 (involving a defendant who waited until one week before trial and eight months after denial of a motion to suppress physical evidence to move for suppression of inculpatory statements).

---

[5]    It bears noting also that a Government victory on the basis of forfeiture would, in all likelihood, be only short-lived.  Milton would almost certainly have a valid ineffective assistance of counsel claim based on counsel's failure to raise the issue before the motion deadline.

In the final analysis, declining to entertain Milton's belated argument for suppression would do grave harm to the interests of justice because, as discussed next, it is meritorious. At the same time, it would do little or nothing to serve the purposes of judicial economy that underlie Rule 12(b)(3). *See United States v. O'Brien*, 926 F.3d 57, 82 (2d Cir. 2019) (observing that Rule 12(b)(3) "serves a number of purposes, including sparing the court, the witnesses, and the parties the burden and expense of a trial and insuring that indictments are not routinely challenged (and dismissed) after the jury has been seated and sworn" (cleaned up)). The Court cannot lose sight of the fact that, in applying Rule 12(b)(3), it is "dealing with carrying out an important social policy and not a narrow, finicky procedural requirement." *Jones v. United States*, 362 U.S. 257, 264 (1960), *overruled on other grounds by United States v. Salvucci*, 448 U.S. 83 (1980). Thus, where, as here, "the [R]ule's underlying policy is not implicated, its technical requirements should not be allowed to prevail over constitutional rights." *United States v. Worthington*, 698 F.2d 820, 824 (6th Cir. 1983).

Accordingly, the Court exercises its discretion to permit Milton to argue that the traffic stop was unreasonably prolonged in violation of the Fourth Amendment.[6]

---

[6]     In the alternative, the Court would and does *sua sponte* extend Milton's deadline to file pretrial motions *nunc pro tunc*. Under Rule 45(b)(1)(B) of the Federal Rules of Criminal Procedure, the Court may do so "if the [movant] failed to act because of excusable neglect." Fed. R. Crim. P. 45(b)(1)(B). In making a finding of excusable neglect, courts consider "(1) the danger of prejudice to the non-movant; (2) the length of the delay and its potential impact upon judicial proceedings; (3) the reason for the delay, including whether it was in the reasonable control of the movant; and (4) whether the movant acted in good faith." *United States v. Scali*, No. 16-CR-466 (NSR), 2018 WL 3536082, at *2 (S.D.N.Y. July 23, 2018) (cleaned up). Overall, "excusable neglect is a flexible concept. Its parameters are informed by, and roughly congruent with, the interests of justice." *United States v. Stein*, 440 F. Supp. 2d 315, 325 (S.D.N.Y. 2006) (cleaned up). Moreover, "at bottom," the determination is "an equitable one." *Id.* (quoting *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993)). Applying these standards, the Court finds that Milton's counsel's delay was the product of excusable neglect for substantially the same reasons discussed above. Accordingly, even if Milton had failed to show good cause for his late motion, the Court would nevertheless exercise

**B.  Whether the Stop Was Prolonged in Violation of the Fourth Amendment**

With respect to the merits, two decisions prescribe the relevant standards: the Supreme Court's decision in *Rodriguez* and the Second Circuit's decision in *Gomez*.

In *Rodriguez*, a police officer stopped a vehicle at 12:06 a.m. after observing it "veer slowly onto the shoulder" of a highway.  575 U.S. at 351.  The officer initially asked the driver why he had veered onto the shoulder and then gathered the driver's license, registration, and proof of insurance.  After running a records check on the driver, the officer returned to the vehicle, asked the sole passenger for his driver's license, and began to question him about where the two men were coming from and where they were going.  The officer then returned to his vehicle, where he completed a records check on the passenger and called for a second officer. The officer then wrote "a warning ticket" for the driver and returned to the stopped vehicle, where he issued and explained the warning to the driver.  *Id.* at 351-52.  The officer finished those tasks by 12:27 or 12:28 a.m., at which point, he later testified, he had "got[ten] all the reason[s] for the stop out of the way[,] . . . [and] t[aken] care of all the business."  *Id.* at 352 (internal quotation marks omitted).  Nevertheless, the officer did not permit the vehicle to leave. Instead, he instructed the driver to exit the vehicle and wait for the second officer to arrive.  At 12:33 a.m., the second officer arrived and the officers conducted a dog sniff of the car.  The dog alerted the officers to the presence of drugs, leading to the discovery of a large bag of methamphetamine in the vehicle and the driver's indictment.

---

its authority to extend the deadline for pre-trial motions to the date on which Milton filed his post-hearing supplemental letter brief.  *See, e.g.*, *Stein*, 440 F. Supp. 2d at 325 (extending the deadline to file a motion to suppress *nunc pro tunc* under Rule 45(b)(1)(B) despite finding that "it [was] doubtful" defendants could show good cause for their delay).

The lower courts denied the driver's motion to suppress on the ground that the "seven- or eight-minute delay" caused by the dog sniff "constituted an acceptable '*de minimis* intrusion on [the driver's] personal liberty.'"  *Id.* at 353.  The Supreme Court granted certiorari and vacated the decision below.  The Court began by reaffirming that "[a] seizure for a traffic violation justifies a police investigation of that violation."  *Id.* at 354.  Additionally, citing *Illinois v. Caballes*, 543 U.S. 405 (2005), and *Arizona v. Johnson*, 555 U.S. 323 (2009), the Court acknowledged that "[a]n officer . . . may conduct certain unrelated checks during an otherwise lawful traffic stop."  575 U.S. at 354-55.  "But," the Court held, an officer "may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual."  *Id.* at 355.  As the Court explained:

> [T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission' — to address the traffic violation that warranted the stop and attend to related safety concerns.  Because addressing the infraction is the purpose of the stop, it may last no longer than is necessary to effectuate that purpose.  Authority for the seizure thus ends when tasks tied to the traffic infraction are — or reasonably should have been — completed.

*Id.* at 354 (cleaned up).  In so holding, the Court rejected the Government's argument "that an officer may incrementally prolong a stop . . . so long as the officer is reasonably diligent . . . and the overall duration of the stop remains reasonable in relation to the duration of other traffic stops involving similar circumstances."  *Id.* at 357 (internal quotation marks omitted).  "The reasonableness of a seizure," the Court explained, "depends on what the police in fact do. . . .  If an officer can complete traffic-based inquiries expeditiously, then that is the amount of time reasonably required to complete the stop's mission. . . .  [A] traffic stop prolonged beyond that point is unlawful."  *Id.* (cleaned up).  The Court concluded by noting that "[t]he critical question" is whether any inquiry by law enforcement that is not traffic-based "prolongs — *i.e.*, adds time to — the stop."  *Id.* (internal quotation marks omitted).

11

The Supreme Court's decision in *Rodriguez* forced the Second Circuit to revisit its own jurisprudence on the duration of traffic stops, which it did in *Gomez*.  In that case, federal agents observed the defendant Brayan Gomez — whom they had been surveilling as part of a drug investigation — commit several traffic violations and stopped his car.  *See* 877 F.3d at 81-82. One of agents approached the car and directed Gomez to turn off the engine.  *Id.* at 82.  "Shortly after" Gomez complied, however, the agent's "questioning detoured from traffic violations to the subject of heroin" and firearms.  *Id.*  The agent demanded the car's registration (but, at least initially, not Gomez's license).  After Gomez produced it, the agent questioned him about where he was coming from, where he was going, and the name of the car owner's spouse (who, it turns out, was another target of the drug investigation).  *Id.* at 82-83.  The agent then asked Gomez to exit the car and, after telling him again that they were investigating heroin and firearms, requested permission to search the car.  Gomez consented.  A search of the car yielded a hotel receipt, whereupon the agent asked Gomez "if he had anything on his person."  *Id.* at 83.  Gomez said he did not, but the agent patted him down and discovered two keys from the hotel.  That led to questions about whether Gomez had stayed at the hotel, which Gomez initially answered untruthfully.  The agent then requested Gomez's consent to search the car's trunk, which Gomez granted.  A search revealed a duffel bag; inside the duffel bag, agents found nearly 400 grams of heroin.  All told, "the entire stop — from the moment [the agent] pulled Gomez over to the moment he opened the duffel bag — lasted about five minutes."  *Id.* at 84.  "Gomez never received a citation for the traffic violations that he committed before the stop."  *Id.*

The district court denied Gomez's motion to suppress on the ground that the stop "lasted five minutes at most" and that the questioning "about matters unrelated to the traffic violation . . . did not unreasonably prolong the stop so as to render it unconstitutional."  *Id.* at 85 (internal

quotation marks omitted).[7]  On appeal, the Second Circuit held that *Rodriguez* compelled the

opposite conclusion.  As the Second Circuit summarized, "*Rodriguez* . . . held that a police stop

'exceeding the time needed to handle the matter for which the stop was made' violates the Fourth

Amendment absent independent reasonable suspicion of another offense.  Moreover, the

'reasonableness of a seizure . . . depends on what the police in fact do,' rather than a comparison

to the duration of a hypothetically expeditious seizure or the duration of a seizure in similar

circumstances."  *Id.* at 90 (quoting *Rodriguez*, 575 U.S. at 350, 357).  Prior Circuit precedent

looking to the total length of a traffic stop in assessing whether unrelated inquiries that prolonged

the stop violated the Fourth Amendment, the Court explained, "conflict[ed] with, and thus must

yield to, *Rodriguez*'s holding: unrelated inquiries that prolong or add time to a traffic stop violate

the Fourth Amendment absent reasonable suspicion of a separate crime."  *Id.*

Applying that holding, the Second Circuit held that "Gomez's seizure, albeit only five

minutes in length," was unconstitutional.  *Id.* at 81.  Specifically, the Court concluded that the

agent's "investigative inquiries unrelated to the traffic violations 'prolong[ed] — *i.e.*, add[ed]

time to — the stop.'"  *Id.* at 91 (quoting *Rodriguez*, 575 U.S. at 357).  "From the moment that

[the agent] first approached [Gomez's car]," the Court observed, "his questioning 'detour[ed]

from th[e] mission' of the stop (Gomez's traffic violations) to the [agents'] heroin-trafficking

investigation."  *Id.* (quoting *Rodriguez*, 575 U.S. at 356).  Indeed, the agent "spent much of the

time of the stop, if not most of it, asking questions and executing searches related to the heroin

---

[7]      Notably, Gomez initially moved to suppress the fruits of the search on grounds unrelated
to the duration of the traffic stop.  *See* 877 F.3d at 84.  As the Court did here, the district court
granted Gomez permission after a suppression hearing to supplement his motion with briefing on
the duration of the stop.  *See id.*  The fact that the district court did so, and then reached the
merits of the argument (with no suggestion from the Second Circuit that its having done so was
an abuse of discretion), supports the Court's decision to reach the merits here.

investigation rather than conducting 'ordinary inquiries incident to the traffic stop' — such as checking Gomez's license, determining whether there were outstanding warrants for him, and inspecting the car's proof of insurance." *Id.* (quoting *Rodriguez*, 575 U.S. at 355).  In short, even though the overall stop and Gomez's detention lasted only about five minutes, the agent "extended the seizure to ask questions pertinent to 'an unrelated criminal investigation.'  Under *Rodriguez*, this violates the Fourth Amendment." *Id.* (quoting *Rodriguez*, 575 U.S. at 357).[8]

In light of *Rodriguez* and *Gomez*, the Court is compelled to grant Milton's motion to suppress.  As in *Gomez*, the overall stop in this case was only about five or six minutes.  But as in *Gomez*, the officers' "investigative inquiries unrelated to the traffic violations 'prolong[ed] — *i.e.*, add[ed] time to — the stop.'"  877 F.3d at 91 (quoting *Rodriguez*, 575 U.S. at 357).  As discussed above, by no later than the 4:30 mark on Officer Burgos's body camera footage, the officers had completed their checks of both the driver and Milton and confirmed that there were no outstanding warrants for either.  At that point, all of the "ordinary inquiries incident to the traffic stop" had been completed, and the only tasks left for the officers to perform were issuing a summons, ticket, or warning for the motor vehicle violations and letting Milton and the driver go.  *Rodriguez*, 575 U.S. at 355 (cleaned up).  Yet the officers did not do either.  (Indeed, as in *Gomez*, they *never* issued a summons, ticket, or warning.  *See* 877 F.3d at 84.)  Instead, their "questioning 'detour[ed] from th[e] mission' of the stop" — the Car's excessive window tinting, the driver's failure to signal when changing lanes, and Milton's failure to wear a seatbelt — to other subjects, including the driver's criminal history, whether there were any fraudulent identifications or weapons in the Car, and whether the driver would consent to a search of the

---

[8]      Notwithstanding that conclusion, the *Gomez* Court affirmed on the ground that, because the agent's search was justified under pre-*Rodriguez* Circuit precedent, the good-faith exception applied.  *See id.* at 81, 93-96.  That portion of the Court's holding is inapplicable here.

Car.  877 F.3d at 91 (quoting *Rodriguez*, 575 U.S. at 356); *see* GX 3, at 4:30-7:10.  These

undisputed facts demonstrate beyond any doubt that "the officers prolonged the seizure by

asking [the driver and Milton] . . . questions not pertinent to the [motor vehicle] violations."  *Id.*

at 80.  Under *Rodriguez* and *Gomez*, this act of prolonging the seizure violated the Fourth

Amendment — even though the resulting delay was just a matter of minutes.

       In arguing otherwise, the Government asserts that the officers "spent approximately the

first five minutes of the stop" — from 1:20 to 6:32 on Officer Burgos's body camera footage —

"running ordinary inquiries, such as looking up the driver's and the defendant's criminal

histories."  Gov't Supp. Br. 2.  But that is not quite accurate and, in any event, immaterial.  As

noted above, the officers had "look[ed] up" the driver's and Milton's criminal histories by the

4:30 mark at the latest; in the two minutes or so that followed, Officer Burgos interrogated the

driver about his criminal history and, prompted by that history, whether he had fraudulent

identifications or weapons in the Car.  *See* GX 3, at 4:30-6:32.  In any event, nothing in

*Rodriguez* suggests that an officer can prolong a car stop to look up a driver's (or passenger's)

criminal history, let alone pose questions unrelated to the traffic stop based on that history.

Under *Rodriguez*, the most that an officer can do is check for outstanding warrants — on the

theory that doing so "serve[s] the same objective as enforcement of the traffic code: ensuring that

vehicles on the road are operated safely and responsibly."  575 U.S. at 355.  Here, however, that

task was completed by the 4:30 mark at the latest.  And in any event, even if the Government

were correct and the officers did conduct ordinary inquiries incident to the traffic stop through

the 6:32 mark on Officer Burgos's body camera footage, the detention did not end at that point,

but continued for approximately one more minute, during which the officers attempted to

persuade the driver to consent to a search of the Car.  *See* GX 3, at 6:32-7:20.

Equally unavailing is the Government's argument that the length of the traffic stop was justified by the need to take precautions for the officers' safety.  *See* Gov't Supp. Br. 2-3.  To be sure, there is a "legitimate and weighty" interest in officer safety.  *Pennsylvania v. Mimms*, 434 U.S. 106, 110 (1977).  But that interest justifies additional precautions only as long as the motor vehicle is "lawfully detained."  *Johnson*, 555 U.S. at 331.  Consistent with that principle, the *Rodriguez* Court held that "safety precautions taken in order to facilitate . . . detours" from the mission of a traffic stop are themselves a Fourth Amendment problem.  575 U.S. at 356.  Thus, the Government's argument would have traction only if the officers had developed a reasonable suspicion of other offenses or that one of the Car's occupants was armed and dangerous *before* the tasks tied to the motor vehicle infractions had been completed (namely, before the 4:30 mark on Officer Burgos's body camera footage).  Notably, however, the Government does not even attempt to argue that the officers had developed such a reasonable suspicion by that time — and for good reason.  By that point, the officers had, at most, observed Milton looking somewhat nervous and moving his right elbow backwards and learned of Milton's criminal history. Without more (for instance, what followed after Milton was directed to exit the Car, including his efforts to conceal his right side and his failure to heed Officer Salcedo's repeated orders to remove his hand from his right jacket pocket, *see* Tr. 148), that is not enough to create reasonable suspicion.  *See, e.g.*, *United States v. Stepp*, 680 F.3d 651, 667 (6th Cir. 2012); *United States v. Jackson*, No. 15-CR-106 (JPO), 2015 WL 4557401, at *8-11 (S.D.N.Y. July 29, 2015).

In short, because the officers' investigative inquiries unrelated to motor vehicle violations prolonged the traffic stop in this case, Milton's continued detention and all that followed from it, including the frisk and seizure of the firearm, violated the Fourth Amendment.  Accordingly, Milton's motion to suppress must be and is GRANTED.  *See, e.g.*, *United States v. Parks*, No.

16

19-CR-87 (LJV) (JJM), 2022 WL 1819383, at *6-9 (W.D.N.Y. June 3, 2022) (concluding that a traffic stop was unreasonably prolonged in violation of the Fourth Amendment where the officer "extended the stop by at least two full minutes with questions for the driver" about where the "driver [was] coming from and going to" that were "wholly unrelated to the 'mission' of the stop," during a time when the officer was "not waiting for a response" to a request for a record check or "waiting for the completion of any traffic related tasks").

## CONCLUSION

For the reasons stated above, the Court holds that the traffic stop that resulted in the search of Milton was unreasonably prolonged in violation of the Fourth Amendment and that the firearm seized as a result of the search that followed must be suppressed.  Accordingly, Milton's motion to suppress is GRANTED on that basis.  The parties should promptly confer with respect to the impact of this ruling on the upcoming trial and Milton's bail status.

The Clerk of Court is directed to terminate ECF Nos. 38, 40.

SO ORDERED.

Dated: August 12, 2022
New York, New York

_____
JESSE M. FURMAN
United States District Judge